And so who's starting off? You're? I'm Mr. Agard. Agard? Yes. Good afternoon, Your Honors. My name is Todd Agard. I'll be representing the government. I'm sharing. If we had a dictionary of names, you'd be the first one listed, wouldn't you? Usually that's true. Yeah. I'm sharing the argument with Assistant U.S. Attorney Chris McLean. I'm going to be handling the first three issues, that is, the definition of asbestos, the affirmative defense, and the statute of limitations. He's going to be handling the evidentiary issues. Okay. And we're going to try and reserve five minutes for rebuttal. This is truly a heartbreaking case. People of Libby, Montana have been working, living, and playing in asbestos-contaminated vermiculite. There was asbestos in the schoolyards, in the youth baseball fields, in homes, in gardens, blowing through town. As a result, the residents of Libby will suffer and are suffering from asbestosis, mesothelioma, lung cancer, and other asbestos-related diseases. The grand jury's charges in this case set forth two bases for criminal liability, knowing endangerment under the Clean Air Act and obstruction of justice. In a series of orders, however, the district court has taken much of the knowing endangerment charges away from the jury. Based on the court's misinterpretation of applicable legal principles. First, the district court used the wrong definition of asbestos. The Clean Air Act's knowing endangerment provision applies to releases of any hazardous air pollutant listed under Section 7412. Section 7412 of the Act, in turn, lists asbestos, C.A.S.T. registry number 1332214. The question for the jury, therefore, should be, does Libby Amphibol fall within the statutory definition of asbestos as set forth in the C.A.S.T. registry? This is a straightforward application of the plain language of the statute. W.R. Grace, however, somehow convinced the district court that a different definition of it, a more limited definition of asbestos that's set forth in the NESHOP regulations somehow supersedes this statutory definition. But the NESHOP definition of asbestos is explicitly limited to the NESHOP regulations. That limitation is set forth at 40 CFR 61.140. Why'd they come up with that name, NESHOP? It is the National Emission Standards for Hazardous Air Pollutants, which is a bit too much of a mouthful to say. So they say NESHOP instead. I apologize for the use of the acronym. All right. I'm a twister. I got a damaged knee, and I just wondered about that. I will try and limit our acronyms to very few in this argument. I'll tell you a joke, see, because I'm getting old, you know. When I was in high school in East L.A., we had a big curtain, you know, on the stage of the school. And one time when I graduated, I was student body president, and it had a big inscription in the lower left-hand corner. And it said, asbestos, class of 29. And I used to look at that, and I thought to myself, you know, they sure are bragging. They say they're the best class we ever had in the school. And I thought that's what it meant. Asbestos means, you know. I thought it was a Spanish word for, like, we're the best, you know. So I've been saving that for at least 70 years. We're happy to provide the opportunity. Thank you. So the NESHAP definition of asbestos that the district court relied on is explicitly limited to the NESHAP regulations, which, of course, aren't even at issue here, do not apply. Moreover, the knowing endangerment provision doesn't say that the hazardous air pollutants are defined as listed in the regulations. They're defined as listed in Section 7412. In any event, even if the NESHAP definition were the applicable definition, the government would be prepared to show that the Libby amphibole, including Winshite and Rickdrite, falls within the definition, is all tremolite asbestos and falls within the NESHAP definition. So either way, whether we're right or the defendants are right as to which definition applies, the district court erred by taking this issue away from the jury. It's especially important here to note that the defendants' arguments would classify substances as not asbestos that cause asbestos-related diseases, that cause asbestosis, that cause mesothelioma. Moreover, these are substances that the defendants themselves throughout their documents, which are in our appendix, referred to as asbestos in asbestiform. So this is somewhat of a sleight of hand on their part. Second, moving on, the district court ---- Asbestiform and asbestos? Asbestiform is a modifier, so you would say this is asbestiform tremolite. But you could say asbestiform tremolite or tremolite asbestos. It's just which asbestiform is the adjective that describes something as being in its asbestos form. A mineral can be asbestiform or non-asbestiform. So moving on, the district court improperly created an affirmative defense. The Clean Air Act's knowing engagement provision states an affirmative defense for releases that are in accordance with an emission standard. The district court held that WR-GRACE could avail itself of this standard, this affirmative defense, even though no emission standard applied to WR-GRACE. But you can only be in accordance with something that applies to you. The asbestos NESHAPs apply only to certain sources. They don't apply to WR-GRACE. Indeed, if you look at the different asbestos NESHAPs, different types of sources have different requirements. And so just as a demolition operation can't say, well, we complied with a NESHAP by following requirements that apply to an asbestos mill, for example, WR-GRACE can't come in and say we complied with a NESHAP that was designed for an entirely different type of source. In any event, even if there were a NESHAP regulation that applied to WR-GRACE, WR-GRACE has picked one requirement out of some of the NESHAP regulations and ignored all of the other requirements. Sotomayor, is this issue one that we should be deciding if we don't grant a mandamus? No. We would readily concede that this Court needs to do this through the mandamus vehicle, that there is not otherwise a basis for this Court's jurisdiction. Well, sometimes when we're remanding a case for trial, that's not the situation here, but there are issues which we don't decide directly, but we tell the district court you better pay heed to this or that when you get to trial. Well, and that actually would work here as well, I think, because the Court clearly has jurisdiction over the rest of the appeal. So if the Court were to use that vehicle to instruct the district court on how to proceed, that would be fine with us as well. So our point is that we need this up on appeal now, because if not, the defendants will be granted an affirmative defense that will in many ways kill the government's case, but it's an affirmative defense that exists nowhere in the statute that was created by the judge. So whether we decide it in your favor or not in your favor, you'd like us to look at it now? Of course we would like it in our favor. Yes, we would like it addressed now, because, I mean, as a matter of fact, if the Court doesn't address it by all intents, it's a decided issue against us, because the district court would then proceed to use the affirmative defense at trial, and, of course, we can't appeal from a conviction, so we'd be precluded from raising the issue in the future. In any event, as I was saying, if there were a NESHAP regulation that applied to W.R. Grace, they haven't complied with any of the other requirements that are MARN insuring requirements, inspection requirements, reporting requirements. Some of these requirements, such as warning signs and fencing, would have been incredibly helpful to the people of Libby to avoid their asbestos exposure, but W.R. Grace simply dismisses these requirements as recordkeeping or mere paperwork. Finally, the district court erroneously dismissed the knowing engagement object of the conspiracy. As the district court acknowledged, the superseding indictment here cured the defect in the original indictment by clarifying the link between certain overt acts and the knowing engagement object. This Court held in Clausen that Section 3288 provides a six-month grace period for bringing new indictment to cure defects that can be cured. Since the defect here was cured by the superseding indictment, Clausen controls, and the district court erred. Unless the Court has any further questions about these issues, I'll turn it over to Mr. McClain. Thank you. All right. Your Honor, the interests of justice require that these issues set forth in the superseding indictment be presented fairly to a jury. That is the government's goal in bringing these appeals. As Mr. Agard has explained, the district court erroneously dismissed the knowing engagement objective, imposed the wrong definition of asbestos to limit evidence, created an affirmative defense for the defendants, and then turned its sights on the government's expert witness testimony and other important evidence critical to proving these knowing endangerment allegations. The district court erroneously excluded W.R. Grace's historical testing records, the ATSDR Pippin's medical study conducted at the EPA's request after discovering this tragedy, and the EPA Phase II testing, which was also conducted on behalf of EPA in an effort to get a handle on the hazardous nature that existed in Libby, Montana. Now, in its ruling, the district court is going to allow the historical evidence to come in on the issue of knowledge. Is that right? That is correct, Your Honor. Is he letting any of the other evidence in on any basis other than the... He did allow the Phase II testing in for proof as to the obstruction counts and certain elements of the obstruction conspiracy. So he did allow it for those purposes. So isn't there plenty there for you? I'm sorry, Your Honor? Isn't there quite a bit there for you to go forward with? Your Honor, the cumulative effect of these orders that we have on appeal eviscerates the government's knowing endangerment case. These orders taken as a whole make it just about impossible for us to proceed at all in front of a jury. And that is all the government is seeking here is an opportunity to present this to a jury and let them decide the issues in the supersedition. Well, how does that explain that to me? How it eviscerates your case? I'm just curious. Well, initially, by taking that knowing endangerment object out of the conspiracy, that was a very big blow to the government's case. By creating an affirmative defense that, in effect, requires the government to prove visible emissions of what is, in fact, an invisible toxic substance. And then these evidentiary exclusionary orders that really take away all of the government's EPA sampling that was conducted, the air monitoring, that definition of asbestos, really destroys our ability to put that evidence in. But you got a lot of stuff from their e-mails, haven't you? I mean, I read all this. Well, we have these historical records that we have that are the subject of one of the motions in limine that we're talking about on this appeal, and Judge Moye prohibited us or didn't allow us to use that for the purpose of proving a release. You know, as far as the Clean Air Act substantive counts are concerned, the government needs to show a knowing release of a hazardous air pollutant that puts persons in danger of serious bodily injury or death. And so we're required to prove these actual releases. And what we intended to do was to utilize these historical records, the phase two sampling and the ATSDR study, for our experts to review along with the sampling evidence that EPA conducted about the air and the ground around Libby when they showed up to help them formulate their opinions that, in fact, after November 1999, there were hazardous conditions existing at Libby that placed those persons that came into contact with those vermiculite materials into danger of serious bodily injury or death. And so by preventing our experts even from … You know, there were lots of asbestos cases in the state of Montana, and I think they all came out of Libby, didn't they? There were many, many plaintiffs. Many came out of Libby. Yes, sir. And when were those filed? Well, they've been filed. When did they come up? They've been filed. I mean, there's been some successful suits in the 90s, and then they became so many of them that W.R. Grace finally filed bankruptcy and stayed all those proceedings. So where are those suits now? I think, as far as I know, they are presently stayed as a result of the bankruptcy proceeding, and the bankruptcy proceeding is ongoing. As we speak. Not only is this evidence admissible on its face or as standalone evidence, but it's clearly relevant, highly probative, and of the type experts can rely on in formulating the expert opinions that the government disclosed in such expert witness disclosures. And this is the problem with Judge Malloy's analysis, is he didn't treat these items of evidence like building blocks, as Justice Stevens in the Joyner case, and this Court in Kennedy v. Collagen. Now, under Rule 703, each of these items of evidence need to be treated as a building block and analyzed in that manner. And instead, he utilized the Rule 702 fit and reliability standard in judging each of these particular items of evidence inadmissible. And that's why we're asserting that he utilized the wrong legal standard in assessing, first of all, the admissibility of this evidence, and then, in some respects, it colored his Rule 403 analysis as well. In looking at and assessing the ATSDR study, Judge Malloy excluded it because he felt it did not prove a causal link between the asbestos exposure and disease. He wrote, The government's case will depend on proof of exposures of sufficient duration and intensity to place another person in imminent danger of death or serious bodily injury. And this is not the law. In fact, the government is not required to establish duration and intensity of a particular release in order to show imminent danger. As this Court set forth in Kennedy v. Collagen, the fact that a cause and effect relationship between agent and disease has not been conclusively shown does not render an expert's testimony inadmissible. And so Judge Malloy's decisions with respect to the use by the government's experts of these building blocks really contradicts this Court's position in law in Kennedy v. Collagen, which, you know, allows experts to look at many, many different types of information as long as it's something that is of the type that that expert can rely on in formulating an opinion. Now, the government wants to reserve five minutes for rebuttal. I'm already into that time. And so I'm going to sit down now unless you have some specific questions for me. Thank you, Your Honors. Thank you. Please, the Court. I'm Christopher Landau, and I represent the defendants in this matter. I'd like to briefly try to address all of the four points that the government has raised this afternoon. First, with respect to the definition of asbestos, counsel for the government says that Judge Malloy failed to apply the, quote, statutory definition of asbestos under the criminal provision of the Clean Air Act. The problem with that argument, as we explain in our brief, is that there is no definition of asbestos in the criminal provision of the Clean Air Act. That provision, Section 7413, instead cross-references the civil provision of the Clean Air Act, where EPA is regulating. And EPA ---- to the CAS or whatever that is? Well, Your Honor, it cross-references a list of subject of substances subject to civil regulation by the EPA. It includes a CAS number in that. And then CAS has a definition. Well, Your Honor, CAS does have a description. It's critical here to understand what CAS is. CAS is a database maintained by the American Chemical Society that essentially provides a bibliographic resource of substances. So you go onto CAS and you have to pay. It's a private database maintained by the American Chemical Society. And, in fact, depending on which level of database you purchase, you get different results. In other words, if you look in the record, our library, and we had a certain service access CAS, and it didn't even come up with that general definition. The government did come up with that definition in their search. In other words, you can buy different levels of access to CAS. It's not something that's publicly available. Are you saying that the people that were running this company didn't know what asbestos was? Well, Your Honor, of course not. I mean, I didn't know when I was in high school. But, Your Honor, everybody might have a different view of asbestos. I mean, the government is trying to put people in prison right now saying that certain things are asbestos. It's very important, especially when you're talking about a criminal statute, that you have some sense of what it is and not just not be wondering. And you know what I'm saying? They're wondering what asbestos is? Well, Your Honor, they don't know that winchite and rictorite are asbestos. CAS itself, and this is a point that Judge Malloy made at pages 442 to 443. What is the dictionary definition of asbestos? Well, Your Honor, and the dictionary definition of asbestos is not in the record in this case because they say it's the CAS definition that controls. We say EPA regulates asbestos. The government, the statute, cross-references the regulatory regime, which is 7412. EPA has defined asbestos. So criminal defendants should be entitled, as Judge Malloy concluded, to ---- Well, let me say this. The asbestos regulations were aimed principally at the use of They didn't want to completely cut off its use, so they set regulations. But that didn't do anything except to define the four types of asbestos that are regularly commercially used to produce products. Well, Your Honor, there's a definition of asbestos. There's also a definition of commercial asbestos, which is a different definition. There's nothing in the definition of asbestos that suggests that it's limited, that it's more than the six types that are regulated. And some, like Tremolite, is not a commercial form of asbestos either. But again, I think the key point here, Your Honor, in a sense, this is a little bit of the government's argument is in motion, because as Judge Malloy pointed out, even if they were correct that CAS provides the definition, and let's just step back for a second, how odd is that, that this private group would be defining what the law is? If that's correct, then the EPA, in its civil definition, in its civil context, would be required to follow the statutory definition of asbestos with the CAS number. Well, you know, I think the government's – I mean, I think that Grace has got a lot of good arguments, but I don't think this is one of them. All right, Your Honor. Well, listen, I'm happy – let me just finish this argument for one second, and then I'll proceed to the other arguments. I'm glad – I think that's going to be a very, very, very hard sell for you. You know, you've got a company that – it's in this business, it's selling an asbestos product, and all of a sudden they don't know what asbestos is. Well, Your Honor, it begs the question. Are windshield – I'm not begging the question. You're begging the question. All the statute has to do is give people fair notice. Right. And – You know, and this is fair notice. Well, what is someone to do, Your Honor? The notice is that the EPA does not consider windshield and brake-to-right asbestos. And nor, for that matter, does Cass. And this is a critical point that Judge Malloy recognized at page 443 of the Excerpts of Record. He pointed out that they're trying to pick a portion of what Cass says about asbestos. If you look at the six forms that the EPA does regulate, each of those is defined as asbestos. It says tremolite asbestos, chrysotile asbestos. Each of them says the heading parent equals asbestos. Is that what Judge Fletcher said? Fair enough, Your Honor. I'll be happy to proceed, if I could, then, to the Clawson issue, which is the statute of limitations issue. The government says that the Section 3288 stands for the broad proposition that a facially invalid and untimely indictment that is dismissed on statute of limitations grounds for failure to allege an overt act during the limitations period can be cured by adding an overt act during the limitations period. We respectfully submit that that's an over-reading of this Court's Clawson decision, not to mention the statutory language that Congress employed in Section 3288. Now, they did plead the crime in the indictment. Well, they pleaded a conspiracy. The problem is they didn't plead any overt acts with respect to the knowing endangerment object of the conspiracy. And we know since the Yates case in the Supreme Court that there must be an overt act for each object of a multiple object conspiracy. They can't get around the overt act requirement and the timeliness requirement by lumping together two different objects, two different conspiracies into a single object. Your opponent says that you under-read it, and you said it's over-read. You know, Your Honor, I will be perfectly candid with you. The Clawson opinion is not an absolute model of clarity. There are some sentences in Clawson that seem to point in different directions, with all respect. I've read it several times, and you have, too. I have, too, Your Honor. And I think that's why it's important to go back to the language of the statute and then to understand what Clawson is saying. And I think if you look at the statute, Section 3288 on its face says that this section, it grants the government generally, the first sentence kind of provides this. Listen, they can be the last sentence that's critical. You're absolutely right, Judge Fletcher. Why don't you read that last sentence? Absolutely. This section does not permit the filing of a new indictment or information where the reason for the dismissal was the failure to file the indictment or information within the period prescribed by the applicable statute of limitations, comma, or some other reason that would bar a new prosecution. Now, the problem that this Court faced in Clawson or the issue in Clawson was that it looked like it fell – like Clawson fell within that last sentence, because, in fact, the district court in Clawson had dismissed the original indictment for failure to meet the statute of limitations. But that was an erroneous dismissal because, as this Court emphasized in Clawson, Clawson's case falls within the category of cases where a re-indictment is permissible within six months because the original indictment was within the limitations period. In other words, in Clawson, they did allege overt acts within the limitations period. What happened there was that the defendant then brought, post-indictment, an affirmative defense of withdrawal, saying, hey, wait a second, I withdrew before those overt acts, and the Court accepted that. Well, the key point is that doesn't change the validity of the indictment. The indictment in Clawson was valid and timely on its face. It later – the fact that the defendant had a successful withdrawal defense, affirmative defense, didn't mean that the indictment was rendered invalid or untimely. So what the government is really asking you to do here is to extend Clawson to a situation where even the original indictment was facially untimely or invalid. Because they're making two arguments. One, they say the original indictment was okay. And second, they amended it to make it clearly okay. So maybe you should address whether the original indictment was okay. Well, Your Honor, in fact, they do – they allege that regardless of whether the original indictment was okay. I understand that. Right. And the – they haven't seriously – they didn't take an appeal from the dismissal of the original indictment. But they amended, so. And they haven't seriously challenged the Yates argument, even in this Court. I mean, they dropped one footnote on page 25 of their brief where they kind of suggested in passing that Yates was a rule about reversals of convictions post-verdict. But that's clearly not correct. If you look at the Yates opinion, the Yates opinion stands for the proposition that you have to have a – in a multiple object, a single conspiracy with multiple objects, you look at each object separately for statute of limitations purpose. And in that case, the Supreme Court reversed a conviction because their – their – one of the objects was untimely. In other words, that case proved that the fact that there's only one single conspiracy alleged doesn't mean that you can avoid having an overt act with respect to each object of the conspiracy, and that has to be timely pleaded. The key point here, Your Honor, and I'm not sure our brief brings this out. Can you pull these overt acts out of this? You know, I've never seen an indictment like this that was – that had so much information in it. Well, Your Honor, again, I think it's – And can you pull out all these overt acts when you – when you go through this indictment as a whole? Judge Malloy, Your Honor, walked through the indictment very carefully. And he said, look, the – the – with respect to the knowing endangerment problem, there's a lot of stuff in this indictment. There's no question about it. Yeah, a lot of stuff. But he went through paragraph by paragraph and said, you know, all of these overt acts are – go to the concealment. This is not a – they don't go to the knowing endangerment problem. And that's the problem. Well, there's a lot of stuff in here about the fact that – that the company knew that people were – were becoming ill because of this. People were dying because of this. But that's not an overt act. They're doctors. The company doctors would examine people throughout the years. Isn't that right? Your Honor, there is stuff like that. But, again, the – the limitations period here is – Was that all that stuff in here? Well, Your Honor, again, the relevant question is, for statute of limitations purposes, is, is there an overt act in the – in the five years previously, which here goes back to November of 1999. None of the – the allegations that Your Honor is referring to are post-November of 99. The only allegations post-November of 99 are concealment allegations of overt acts. It's important to recognize that the crime of conspiracy is a very dangerous crime, as Justice Jackson recognized 50 or 60 years ago. It's the – it's the darling of the – Well, I agree with you on that. And, Your Honor, and this is – this is why this is so important. This is – this is a very – the government – it's already a very powerful tool in the prosecutor's arsenal. And the one check on that is that the prosecutor – it's a mind crime, which is so dangerous in our society. The check on it is you need an overt act within the limitations period. That element of the crime goes to the statute of limitations. That's why it's a special element. It's not like any other element of the crime, which can be cured. Scienter, if they leave out interstate commerce, those things can be cured, because if that's missing, the district court doesn't dismiss it for failure to meet the statute of limitations. What if they had alleged an overt act that actually took place within the five-year period, but they mistimed it and set it as an earlier date in the indictment? Would the indictment be defective? You know, Your Honor, in preparing for this argument, we went over that hypothetical a number of times. The – the – the typo hypothetical is an interesting one. It's hard to imagine, frankly, that the district court, if there's just a typo, would have dismissed the indictment as untimely in the first place. If it's an obvious typo, if it says 1893 instead of 1993, you know, arguably there you're on fair notice. Of course, this case is – is different, but I think in that case, you know, the government would presumably then appeal that dismissal to this Court, which they're entitled to do under Section 3731. And — That's another question that we have. Are they barred from bringing that issue now because they didn't appeal it before? Your Honor, I think it's very problematic for them to try and smuggle it in kind of collaterally. I mean, they had the shot to do it, and they really should have a clear rule or a clear understanding about what they can and cannot do. I think basically you don't need to stretch Claussen the way that they're asking you to stretch it because, frankly, they clearly can bring an original indictment. They don't dispute that they – they could have brought it. And in other words, the implications of this are not that great because if they know that Claussen – if you kind of go back to the statute, you say, look, if it's untimely, I think the key principle is this. You can't cure something that was originally untimely. If it was originally timely, then it can be fixed. But if the original one was untimely, you can't make it timely if it was untimely. And I think that's the key point. And therefore, they could have – they could have appealed that. Now, again, if, in fact, they could show that the original one was timely, I mean, that's pretty much what happened in Claussen, in the sense that in Claussen, they took a gamble, and the court there held essentially there was no time bar in Claussen because, in fact, there were overt acts alleged within the limitations period. Here, there weren't. I see my time is going on. I'd like to briefly at least address if there's any conflict between the corporation and its employees. You're representing all of them. I am for purposes of this appeal, Your Honor. Is there any conflict of interest involved in that representation? Not that we're aware of, Your Honor. I mean, we've been working cooperatively, and I am standing here today on behalf of the corporation and individuals that are facing prison time as a result of this. Well, I understand. I understand that. But have they each individually authorized you to represent them? Yes, Your Honor. Yes, Your Honor. And they're here in the courtroom today. Well, I mean, let's – well. Well, I'm glad to hear you say that because that's an important issue always with us. Absolutely, Your Honor. I'm sorry, Justice Krager. No, that's all right. On the visible emissions point, the point here is really it's just a question of statutory construction. The government – the language of the statute says, with respect to an air pollutant for which an emissions standard has been established, if you go back to the statute and you go back, for any air pollutant for which the administrator has set an emissions standard, or for any source for which a permit has been issued under Subject Chapter 5 of the chapter, a release of such pollutant in accordance with that standard or permit shall constitute a violation of this paragraph – excuse me, shall not constitute a violation. So it's basically giving a safe harbor, which kind of makes sense, that if the EPA, which has a statutory responsibility to regulate releases of hazardous air pollutants, if the EPA doesn't even consider a particular thing worthy of civil regulation, the idea that people are going to prison for that same release is preposterous. It's – it's perverse. Let me ask you this. The way the regulations are set up, they set it up for different activities. Now, which activities do you bring yourself under? Well, Your Honor, it is true that none of the specific activities that are covered by these apply to the mining operations. But that – again, the way the statute is written, it doesn't say for any air pollutant that is subject – from a source subject to a regulation, it's for any pollutant for which the administrator has set an emissions standard. He has set a no-visible emissions standard. So what they're basically doing is setting it for asbestos mills, for roadways, for manufacturing, for demolition, for spraying, for fabricating. Correct, Your Honor, but those are – those are sources. It doesn't say for any source for which an air pollutant – an emissions standard has been established, for any release from any source. It says for any air pollutant. So the – the statute on its face looks to the pollutant, not the source. And again, Your Honor, I think you made this point earlier that this is here on mandamus. And I respectfully disagree with the suggestion that Your Honor made earlier that you can issue guidance on this without the – You wouldn't like me to issue one that said you were fine? Well, Your Honor, you know, I could – I could go for that, I suppose. But, you know, but – but with all the – Isn't this something that's important for the trial of the case? Well, Your Honor, I think it is important, but, you know, frankly, the way the interlocutory appeals under Section 3731 are established, this is somewhat different, I think, than the typical case where a final judgment is here and you have the whole case before you. I think here, you only have very specific portions of the case before you that fit into the pigeonholes of Section 3731. Well, I understand that, but you've kind of tendered the issue and the judges said you're right, you get to put on an affirmative defense. And so I – maybe we should say you're right or wrong. But, you know, Your Honor, but again, the government has not even argued that this jurisdiction. And I think, as you know, those are very narrow categories. And I think, therefore – But you've probably seen a lot of our cases in which, when we've gotten to a final judgment and we're sending something back for retrial and we clearly decided on this issue, but we say, well, district court judge, you better watch out. We do it all the time. We do it all the time. I think you do it all the time. You're talking about – Not all the time. Well, but when you say retrial, I think it's – It's not an everyday occurrence. But I think it's in final judgment cases. When you, in fact, have the whole case here, I think in this – the difference I was trying to suggest here, perhaps inartfully, is that it's no error or accident that the government is conceding that the mandamus standard applies, because there's only a very limited issue. And because of this particular posture, which is somewhat unusual of the interlocutory appeal, that that general instinct that you might have to be able to give guidance is not – does not apply. I understand that you'd love us not to rule on it. I truly question a jurisdictional question of your authority or interlocutory appeal, Your Honor, and you're obviously very familiar with the statutory scheme, but I do think that this is one where you have to, you know, really follow the language of the statute that clearly defines what's up here. I've thought about it a lot, and I just – you know, we want a fair trial. You want a fair trial. But we want an error-free trial, too, if we can have it. Sure. And, you know, Judge Malloy – and that's, again, you know, perhaps the overarching point here. Judge Malloy is intimately familiar with all these Libby matters. He's been living with this stuff now for five or six years. And just to briefly cover the evidentiary points, he – he recognized that these are – that the evidence that the government's talking about is very dangerous evidence for a criminal defendant, that this is the kind of thing where there's prejudicial value. And he excluded this in a very limited sense for certain purposes. He said the indoor air analysis cannot come in to – for the purpose of proving outdoor air releases and – and the expert testimony that's based on that indoor testing. Because, obviously, indoor air circulates in a very different way than outdoor air. I mean, you know that from smoking or whatever, that there's just a fundamental difference, and it's not fair to try and put people in prison for outdoor air releases. But isn't it established that people that are not actually in the mining operation, you know, wives, families, other people, that have come down with asbestosis? The government, Your Honor, can prove whatever they wish to. Well, I mean, that happened. Well, Your Honor, but they are – They settled cases on that basis. They are trying to prove – to the extent they are trying to prove outdoor air releases, the propensity of this asbestos to go into the air without – with indoor air data, as Judge Malloy recognized after a very close examination of this evidence, you can't – they didn't show any mechanism, any scientifically reliable mechanism for extrapolating indoor air dispersion into outdoor air dispersion. The standard for criminal liability under the Knowing and Danger Provision of the And they can't get there with – to show imminent endangerment. Because the outdoor air is very different, it's much harder, obviously, to imminently endanger somebody. You can't just take the results of indoor air testing and say, well, because there was an indoor air release, therefore, there was an outdoor air release. The concentrations were all different. Again, it's a – Judge Malloy, you know, went very carefully through the evidence. And the same thing with the ATSDR study. I wasn't sure in reading his decisions that he was making a clear distinction between evidence that can't be introduced on its own and evidence not admissible but that can be used by an expert in analyzing his case. And it seemed to me there's some refuttlement there. Your Honor, I respectfully disagree with that. I think the government has tried to say that. I think the key point here is that the government is relying exclusively on that evidence. In other words, if the underlying evidence is bad, is tainted in some way, or is unreliable in some way, then it's obviously under Daubert not appropriate for experts to base a conclusion on that evidence. And see, they've tried to say, well, what he's doing here is he's basically applying Daubert on a document-by-document basis. They've tried to create that as the issue before you all. We're not disputing that it's not applicable on a document-by-document basis. But it is where the government is trying to introduce testimony based on a single document. In other words, to the extent that their experts are purporting to base expert testimony on the results of indoor air testing exclusively and the ATSDR study exclusively, well, then, of course, you have to ask the question under Daubert. Because, again, you've got the Daubert set of issues for the experts and the 401, 402, 403 set of issues with the underlying evidence. It's going to depend on what the expert is going to testify. Well, but, Your Honor, they've said they've done these indoor studies and this is what they've shown. And in my humble opinion, the same characteristics, the same movements would apply to the ambient situation. God bless them if they were to say so. It happens all the time, you know. Your Honor, if they come in and they were to say, you know, we base this not on the indoor air study but on the following ten other things, Judge Malloy didn't preclude them from doing that. What he said is, to the extent of what they're trying to do here is they're trying to issue experts to draw conclusions like causation and the extent of outdoor air concentration and dispersion from the unreliable source of the indoor air testing and the ATSDR study. And that's what Judge Malloy said you cannot do. In other words, you cannot do that. You cannot do that in an unreliable source. Well, because with respect to indoor air testing, indoor air dispersion is very different than outdoor air dispersion. The government's experts can come in. They can do outdoor – they could have done outdoor air testing. They don't – they didn't need a fortiori to rely on the indoor air testing. In other words, the concentration, the way indoor air moves is different. If you release something outdoors, it's a lot different from a scientific point of view. Let me ask. Is this relevant to the concealment charge? Well, Your – as Your Honor, I believe, noted in your exchange with the government before, it can be relevant to knowledge and other things for which Judge Malloy did not exclude it. In other words – It was unclear to me, and this is a lot of stuff to read with a lot of other cases going on. I did the best I could. But in the concealment, did he say it could come in for knowledge? He did say that as to one thing. Yes, Your Honor. And he did – Yes. For his knowledge of its dangerousness. He did say that. Or he said – put it this way. He didn't yet exclude it for that reason. I think he reserved – Yeah, okay. Yeah. So that's an important distinction. So that issue – I mean, the only issue that's here before you, again, because of the structure of 3731 that only allows them to bring up things that are actually an exclusion, he reserved that. You're saying that the experts can't look at it – at this when they're trying to decide whether there was a dangerous release. Is that what he's saying? No. I think what he's saying is two things. With respect to the indoor air testing, the experts can't come up with conclusions about the concentration in the outdoor air based on indoor air tests because of the inherent difference between indoor air releases and outdoor air releases. And – If that's his – Excuse me? Is that a Dobbert ruling? Well, with respect to the – again, it gets a little bit confusing here because with respect to each – with respect to both the indoor air testing and with respect to the ATSDR study, you have two rulings for each one. You've got an underlying 403 ruling, which is the evidence itself, and then you've got a 702 ruling, which is the Dobbert ruling, which is about the expert testimony. And so in a sense, they kind of follow, though, because if the evidence is unreliable and unduly prejudicial, and – and so – Well, how are you going to tell that unless you're in the middle of a trial? Excuse me, Your Honor? How can you judge a 403 ruling unless you're in the middle of a trial? Well, Your Honor – You have to – you have to look at what's – what's been introduced to make that decision, to whether the – whether the prejudicial effect outweighs the probative value. But both sides, Your Honor, have lined this up for motions in limine. I mean, it's – in other words, to the extent that Dobbert kinds – you know, there are certain kinds of these issues that can come up pretrial. I don't think the government has suggested that it's inappropriate to have decided this at all pretrial. And, in fact, again, Judge Malloy – Well, I mean, you can do that during a trial at a – at a sidebar conference or – or a motion when the jury is out. But how – how is a judge to make that type of decision? Well, because – Unless you're in the middle of a trial. Well, because, again, it seems to me that these are really – Well, anyway, when I was a trial judge, that's what I did, because you can't really tell, you know, when you're looking at a cold record. But Judge Malloy, of course, is very familiar with this Libby case, and he's been living this case for six years. We're all familiar with the Libby case. Well, Your Honor, again – I mean, I think this is the classic discretionary judgment that – that you leave up to the trial court for – and the government doesn't deny its abuse of discretion standard. And – and we would respectfully submit that this is not an – not an abuse of discretion. So – so for that reason, again, you know, going back, the – the – on the asbestos definition, we would submit, as Judge Malloy said, that we win, that it should be – you do look to the EPA standard that is cross-referenced. Even if you don't, you look to CAS. We've been under the CAS definition, given that CAS excludes – specifically excludes Winscheid and Richterite on the – on the Claussen issue. Well, now, they don't – CAS doesn't exclude it. It just doesn't say what it is. It doesn't say it's asbestos. They're trying to take half the definition of it. They're trying to basically say, well, you ignore the part of CAS that basically says heading parent equals asbestos for the six things that EPA regulates, and the of asbestos. They're trying to basically hide that. And now they're kind of saying, well, this is a jury issue, as if you basically – I was just quibbling with your saying that CAS excluded the – I'm sorry, Your Honor. Then for precision, you're – you're correct. But, I mean, they are trying to be selective, as Judge Malloy pointed out, so that we win even under CAS. Again, we think the better definition is the – is what the EPA has done. And, again, when particularly talking about trying to put people in prison and – and that you can say, well, you expect these people to know what asbestos is because they're in the business. Because the question is, are Winshite and Rictorite asbestos? And if the EPA doesn't consider Winshite and Rictorite asbestos, it's odd to have the same government, of which the EPA is a part, putting people in prison for releasing Winshite and Rictorite. You made your point. And the difference between indoor testing and outdoor testing, a universal rule? Yes, Your Honor. Does that apply to all pollutants? I – I think, as Judge Malloy – I don't think the government is serious about whooping cough. Well, again, I think the dispersion, in other words, if you have certain molecules, that's why tuberculosis is more – I think whooping cough in a room is worse than whooping cough out in the parking lot. I think if you have somebody with tuberculosis – Now, what about – does that apply to all pollutants? Does that test – the difference in the testing of the effect of a pollutant depend upon whether it's an indoor test or an outdoor test? I would tend to think the answer is yes, Your Honor. I'm not a scientist, so I'm not here to – I don't know that I can – But you're arguing outdoor testing can't – you can't detect asbestos. Well, again, it may depend in certain cases on the – asbestos, at least, given that it's airborne under certain – it's really the way it's dispersed in the air. I don't know if that kind of dispersion analysis would apply to all substances. I mean, if you had lead, I'm not sure – in other words, that a test on lead indoors would be different than a test on lead outdoors, because I don't know that that goes – I'm just not prepared to give you a definitive answer. We're talking about something that floats through the air. Right, but I mean, tuberculosis is an example, like this guy who just got on the plane, right? I mean, going on a plane was a very dangerous thing for that guy to do, because it's in a different enclosed environment than it is if you are just not in that environment. It's true for smoking, right? I mean, smoking indoors is different than smoking outdoors. And even though you can say, well – Not really, no. But you still – I mean, that's different. It can still be dangerous, but at least with respect to the concentration. And there are different paths. There are different – When I got off the plane here, and they have that smoking section, people outside smoking, I thought the terminal was on fire when I walked in. But I think you wouldn't – you wouldn't take the indoor air dispersion of smoking to prove an outdoor air release, an outdoor – in other words, if the government's going to try and put people in prison, they should do the testing outdoors if they're trying to prove outdoor concentration. Well, you know, you're kind of challenging the whole – in a way, I'm listening to you. And it's interesting, because under federal law, we put people in prison every day where we have statutes that are not really that clear, you know. And people that get convicted on evidence where there's a – oh, kind of a high degree of speculation by experts. Well, Your Honor, I – We've got a U.S. attorney sitting here to argue the case today, you know, on a drug, no-drug case, you know. And I thought you – I mean, how you can extract those from the law. Express some concern. Yeah, well, I'm concerned about it, that the whole system needs to be revised. But – And we had Senate Bill 1 back in 1968 that's never been adopted, you know. I mean, there's a lot of things going on. But I was – And I'm right. I think Your Honor is – I learned from the great Michael Tiger. You know Tiger? Do you? Is this the Tiger who's the lawyer who's represented? Yeah, and – People in the controversial, like – Yeah, he's a professor at Texas. Okay, yes. I've heard of him. Not the golfer. No, no, no. But he represented, like – He writes plays. And when I saw him in San Francisco, the point he made was the conspiracy laws were developed by the English to do what? You know what they – To keep down the Irish. So you couldn't get – Two Irishmen would get together, you know, and talk on the street. That was a conspiracy, see? And that's – And if two working people got on the street and talked about picketing, that was another conspiracy. That is lurking in the background of the case, Your Honor. I mean, it's no coincidence that on the Claussen point, the real leading case, Claussen is a conspiracy case. Conspiracy is such a dangerous kind of crime. That's why you have – Well, maybe we get the business people in this country to send the lobbyists up to Washington to change it, huh? Your Honor, I mean, but I think that's what this is all about. It is ultimately about the due process and the fair notice concerns. So I – my eyesight is terrible. It says – Time up. Sit down. I will take the hint, Your Honors. No, I enjoyed – I enjoyed talking to you. Thank you very much, Your Honor. Okay. So why didn't you put the overt acts in? Did you? Yes, we put the overt acts in. The only question was – and we thought that they were very clearly going to both objects. The district court said that could be – I can't tell. I'm going to choose one. And we said we could appeal or we could just make absolutely clear what we thought was clear before. That's what we did. I think it's interesting if you look at – Claussen is not the only case from this circuit that has addressed this issue. If you look at Claussen, it cites a number of earlier cases. Well, where in the first indictment did you put these overt acts? The ones that the district court focused on were in the – like around the 175. Yeah. And what we did was make clear that the conduct there not only went to obstruction of justice but also furthered the releases that endangered the Libby community. Now, what I was saying is that Claussen is not the only case. There are earlier cases that are cited in Claussen, including the Charney case. In the Charney case, a whole new offense was added to the superseding indictment. So if we can add a new offense, as we did in Charney, a new overt act, as we did in Claussen, it follows a fortiori that we can clarify whether an overt act goes to one or both of the objects of the conspiracy. On the definition of asbestos, the Clean Air Act is clear. It says, looked in Section 7412, that this says asbestos. It doesn't say asbestos as defined in the regulations. It doesn't say asbestos as EPA chooses to regulate it. It says asbestos. As for whether the C.A.S.T. Registry is some secret formula that can't be figured out, these defendants, if you look in the appendix, their correspondence back and forth cited the C.A.S.T. Registry all the time. The EPA website that includes the definition of asbestos is on EPA's website. And finally, so whether when you get down to the nitty-gritty details, whether Winshite and Richrite fall within the C.A.S.T. definition, the NESHAP definition, you have experts on both sides that are saying somewhat conflicting things. That's a classic jury issue, not something that the district court should have decided as a matter of law based purely on factual assumption without any further information. Now as to the ‑‑ I think I would be uncomfortable submitting that kind of an issue to the jury. It's kind of a ‑‑ it is or it isn't scientifically, Winshite and Richrite. Right. But it's a ‑‑ I mean, it's a factual matter of dispute, right? You have some defendants that say ‑‑ I mean, some experts that say by our application of the EPA laboratory principles, Winshite and Richrite fall within the definition of tremolite asbestos. You have their experts who say our laboratory analysis doesn't show that. I mean, that's a factual issue. But they all show them to be silicates and they all show them to be ‑‑ have fibers that cause trouble. Right. And that's been the general definition of asbestos since I took chemistry. Right. And as Your Honor knows, that's what the Cass Registry relies on as well. So we think it's clear that this would fall in. But again, if they want to offer an expert that says this isn't asbestos under the Cass Registry definition, they can do that at trial. But again, it was just wrong for the district court to assume precisely the contrary. Now as to the affirmative defense issue, there are two conditions for the affirmative defense to be applicable. One is there has to be an emission standard in general for the pollutant. And two is you have to show that you were in accordance with the emission standard. The defendants have focused entirely on the first and say, well, if the first is true, then we can follow that emission standard, regardless of whether it even applies to us. To state how that emission standard would apply to what were happening here ‑‑ If I read those regulations, it seemed to be if there was no visible emission, end of story. No, that's not ‑‑ If there was a visible emission, then you had to do all these other things. No, there are additional requirements even if you have no visible emissions. You have to monitor for them. You have to send someone out that looks at them. You have to keep records about it. But more importantly, for the types of asbestos sources that are the most similar, I mean, here, WREX doesn't even fall within any of these sources. But if you look at the asbestos mill regulations or the ‑‑ I forget which regulation in ‑‑ I don't have it in front of me. But there are regulations that apply to if you have piles of sort of byproducts sitting around your facility. That, of course, is the closest to what we have here where you have the town of Libby where there are piles of asbestos‑contaminated vermiculite throughout the town. You have to put up a fence around it. You have to put up a sign that says, warning, asbestos do not create dust. Contrast that to the facts that are alleged in the indictment of children playing in the piles of vermiculite. And you see just how far the defendant's no visible emission standard falls from the actual applicable standards that would apply. There's no way that they can, with a straight face, say that EPA would have condoned the type of conduct that happened here and said that it was safe and could be civilly regulated. To have asbestos in a track, to have asbestos on a baseball playing field, of course EPA would never promulgate a standard that said that that was okay. Finally, as to the evidentiary issues, first I wanted to point out that these same materials now that they say are unreliable and fall outside a dapper are the same materials that EPA relied on for the civil cleanup and for that this court relied on in affirming the civil cleanup in its earlier decision with no question about the reliability and used those as a basis to confirm that the people of Libby faced an ongoing danger. Second, I think Mr. Landau rightly said to several of the court's questions, he's not a scientist. And that's our point exactly. Mr. Landau is not a scientist. I'm not a scientist. The district court is not a scientist. The problem is when the district court makes factual assumptions about what a scientist would say about the evidence that he excluded. Would a scientist say that it's appropriate to look at an indoor sample in order to extrapolate to outdoor conditions? I don't know. Mr. Landau doesn't know. The district court didn't know. Experts do know. And the district court improperly disallowed experts from relying on that information. Kennedy, let me ask you this. If something is friable, is that the way you pronounce that word? Indoors. Would that be relevant to determine if it's friable outdoors? Friable is simply referring to the condition does it crumble. Crumble, yeah. To my mind, it clearly, if it crumbles indoors, it would crumble outdoors. Now, what happens to it after you crumble, maybe that might vary a little bit. But that's precisely our point. A scientist knows these things. Well, you have these little strands. Right, right. I mean, I would think. I would think that much of what the... I didn't learn these things because I thought asbestos might be, you know, we're the best. But, you know, that's what it means. Friable. Well, asbestos actually refers to the fibers, right? Yeah, the fibers. When they are friable, when they crumble easily, that makes them much more dangerous. Yeah. Yes. But our point is that the district court erred in making factual assumptions without looking to whether an expert could come to a different conclusion. Second, Mr. Lendo made this interesting assertion that the district court excluded this evidence only because our experts were going to rely on a single document. Look at the expert disclosures that are in the appendix. There is a voluminous list for every one of these experts of the multiple documents that they're going to rely on. Those are in volume three of our excerpts of record. It is simply not the case that our experts are going to look at a single... that any of our experts are going to look at a single document and base their testimony on that evidence. So his factual assertion is incorrect. But second, even if it was, that's ignoring the critical point that, going back to Justice Stevens' decision in the Joyner decision, that you have to look at these as building blocks. Sometimes the building block is going to be this piece of evidence and other documents. Sometimes it's going to add one of the building blocks is going to be the expert. The problem with what the district court did in its evidentiary rulings is it didn't look at any other building blocks. It looked only at the document in question. And so to say that an expert can't rely on a document because the district court didn't know how that could go to an element of defense leaves the expert entirely out of the equation, contrary to Justice Stevens' analysis and, as Mr. McClain cited, any of the decisions of this Court. These are the — when it comes down to it, many of these evidentiary issues involve a battle of the experts. They can come forward with their experts to say that an indoor study doesn't show anything about an outdoor. That doesn't mean — just because they can offer an expert to make that assertion doesn't mean that a jury shouldn't be able to decide between the conflicting expert testimony. They can cross-examine our experts. We can cross-examine — We understand that. Yeah. So — and just to sum up exactly what we're trying to get out of this evidence, much of this evidence, of this older evidence, shows the — and why it's important not just for knowledge but for the release and the endangerment issues, much of this evidence shows that under a wide variety of circumstances, normal everyday tasks such as sweeping, gardening, things like that, with this vermiculite, kick up enough asbestos that there are significant exposures that endanger people. Thank you, Your Honor. All right. I guess that's it. And thank you. And the matter is submitted. Court will recess until 9 a.m. tomorrow morning. All rise. This court for this session stands adjourned. Thank you. Thank you.
judges: B. Fletcher, Pregerson, Ferguson